## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| **TIMOTHY J. MUELLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 2:19-cv-00216-SLC** |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** *sued as Andrew Saul,* | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Timothy J. Mueller appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB"). (ECF 1). Because the third

of Mueller's three arguments raised on appeal is persuasive, the Commissioner's decision will be

REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in

accordance with this Opinion and Order.

## I. FACTUAL AND PROCEDURAL HISTORY

Mueller applied for DIB in March 2016 alleging disability as of June 15, 2013. (ECF 9

Administrative Record ("AR") 28, 202-03). Mueller's claim was denied initially and upon

reconsideration. (AR 127-30, 136-39). On April 18, 2018, administrative law judge ("ALJ")

Jeanette Schrand conducted an administrative hearing at which Mueller, who was represented by

counsel, and a vocational expert testified. (AR 51-105). On August 31, 2018, the ALJ rendered

an unfavorable decision to Mueller, concluding that he was not disabled because he could

perform his past relevant work as a sales representative/floor covering and sales

representative/educational courses despite the limitations caused by his impairments. (AR 28-

37).  The Appeals Council denied Mueller's request for review (AR 1-6), at which point the

ALJ's decision became the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.

Mueller filed a complaint with this Court on June 10, 2019, seeking relief from the

Commissioner's decision.  (ECF 1).  In his appeal, Mueller alleges that a remand is necessary

because the ALJ:  (1) improperly evaluated his symptom testimony; (2) incorrectly analyzed the

medical source opinions; and (3) failed to obtain an updated medical review of the evidence.

(ECF 13 at 10-21).

At the time of the ALJ's decision, Mueller was fifty-two years old (AR 202); had a high

school education (AR 221); and had work experience as a grocery store clerk, a floor coverings

salesperson, an educational courses sales representative, and a building materials sales attendant.

(AR 97, 227).  In his application, Mueller alleged disability due to prostate cancer, stage one;

high blood pressure; bilateral arm tendinitis; and chronic obstructive pulmonary disease (COPD).

(AR 220).  Additionally, after filing his application Mueller suffered an ischemic stroke

presenting as slightly slurred speech and a very mild facial droop.  (AR 884, 888, 903).

## II.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court the "power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner . . . , with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted).  The decision will be reversed "only if [it is] not supported by substantial

evidence or if the ALJ applied an erroneous legal standard." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court "review[s] the entire administrative record, but do[es] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Id.* (citations omitted). "Rather, if the findings of the Commissioner . . . are supported by substantial evidence, they are conclusive." *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III.  ANALYSIS

#### A.  *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence:  "(1) whether the claimant is currently [un]employed, (2) whether the claimant has a severe impairment, (3) whether the

claimant's impairment is one that the Commissioner considers conclusively disabling, (4) . . . whether [he] can perform [his] past relevant work; and (5) whether the claimant is incapable of performing any work in the national economy."[1]  *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); *see also* 20 C.F.R. § 404.1520.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B.  The Commissioner's Final Decision

On August 31, 2018, the ALJ issued a decision that ultimately became the Commissioner's final decision.  (AR 28-37).  At step one, the ALJ concluded that Mueller had not engaged in substantial gainful activity after his alleged onset date of June 15, 2013.  (AR 30). At step two, the ALJ found that Mueller's COPD and bilateral elbow tendinitis were severe impairments, but that his prostate cancer, ischemic stroke, back pain, and obstructive sleep apnea were among his non-severe impairments.  (AR 30-32).  At step three, the ALJ concluded that Mueller did not have an impairment or combination of impairments severe enough to meet or equal a listing.  (AR 33).

Before proceeding to step four, the ALJ determined that Mueller's symptom testimony was not entirely consistent with the medical evidence and other evidence of record with respect

---

[1] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. § 404.1520(e).

to his limitations.  (AR 34-35).  The ALJ assigned Mueller the following RFC:

> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR
> 404.1567(b) except he is limited to occasional climbing of ramps, stairs, ladders,
> ropes, or scaffolds; frequent balancing, stooping, crouching, kneeling, and
> crawling; frequent handling with the bilateral upper extremities; and never
> exposed to extreme cold, heat, or excessive vibrations.

(AR 34).

Based on the assigned RFC and the vocational expert's testimony, the ALJ found at step

four that Mueller was able to perform his past relevant work as a floor covering sales

representative and educational course sales representative, both as he actually performed this

work and as it is generally performed.  (AR 37).  Therefore, Mueller's application for DIB was

denied.  (AR 37).

### C.  Symptom Testimony

Mueller first contends that the ALJ improperly discounted his symptom testimony in

finding that his testimony was "not entirely consistent" with the medical evidence and other

evidence of record.  (ECF 13 at 10-15; *see* AR 34-35).  For the following reasons, the ALJ's

assessment of Mueller's symptom testimony, in and of itself, does not merit a remand of the

Commissioner's decision.

An ALJ's credibility determination concerning a claimant's symptom testimony is

entitled to special deference because the ALJ is in the best position to evaluate the credibility of

a witness.  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Elder v. Berryhill*, 774 F.

App'x 980, 983 (7th Cir. 2019).  If an ALJ's determination is grounded in the record and she

articulates her analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d

998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the

evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), her determination will be upheld unless it is "patently wrong," *Powers*, 207 F.3d at 435; *see also Green v. Saul*, 781 F App'x 522, 527 (7th Cir. 2019).

When assessing the credibility of Mueller's symptom testimony, the ALJ considered various factors set forth in 20 C.F.R. § 404.1529(c)(3),[2] including Mueller's statements to medical providers, physical examination findings, diagnostic test results, the treatment that he underwent for his conditions, and his daily activities.  (AR 34-36).  Mueller, however, contends that the ALJ erred in three respects when assessing his symptom testimony:  (1) by neglecting to properly evaluate how his history of prostate cancer and medication side effects caused frequent urination; (2) by unduly relying on his minimal daily activities and a trip to Las Vegas; and (3) by noting that he was not using a cane one day after it was prescribed.  (ECF 13 at 10-15).  The Court will discuss each of Mueller's arguments in turn.

1. Urinary Frequency

Mueller, citing his history of prostate cancer, contends that the ALJ failed to consider his medication side effect of needing "to drink water constantly," which causes him to need "a five-minute toilet break every 45 minutes since 2013."  (*Id.* at 10).  He emphasizes that the vocational expert testified that a hypothetical individual who requires a five-minute break every forty-five minutes could not maintain competitive employment.  (*Id.* (citing AR 100-01)).

But the ALJ *did* consider Mueller's testimony about his increased urinary frequency.  (AR 34 ("He testified that he has to go to the bathroom irregularly due to prostate cancer

---

[2] These factors include:  (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of his pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications he takes; (5) treatment, other than medication, he receives; (6) any measures used to relieve pain or other symptoms; and (7) other factors.  20 C.F.R. § 404.1529(c)(3).

symptoms, and having to drink significant amounts of water due to his medications."), 35 ("The claimant reported frequency and urgency with urination after being diagnosed with prostate cancer.")).  The ALJ weighed this testimony against the medical records reflecting that Mueller had only minimal voiding symptoms, and that he had not undergone any surgery or treatment for his prostate cancer.  (AR 31, 323, 329).

It is true that the ALJ could have more specifically explained why she discounted Mueller's complaints of urinary frequency to the extent it is a side effect of his medications.[3] Having said that, Mueller does not support his claim of urinary frequency as a medication side effect with citations to any medical evidence or complaints about urinary frequency to his treating providers.  (*See* ECF 13 at 11); *Karafezieva v. Colvin*, No. 15 C 1186, 2016 WL 4137203, at *8 (N.D. Ill. Aug. 4, 2016) (finding no error as to the ALJ's analysis of the claimant's claim of medication side effects, including frequent urination, where no doctor opined that the claimant would have any functional limitations associated with this issue).  In fact, when the ALJ asked Mueller at the hearing whether he experienced any side effects from his medications, he responded "Not that I'm aware of."  (AR 89-90).  An ALJ is entitled to discount a claimant's symptom testimony where it is not well supported by the objective medical evidence or where it conflicts with the claimant's prior statements to medical providers.  *See Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other

---

[3] The Commissioner points out that Mueller consistently denied dysuria, frequency, urgency, and hematuria to his medical providers (ECF 18 at 5 (citing AR 716, 773, 767, 777, 782, 787, 792, 797, 802, 806, 812, 817, 821, 826, 831, 835, 840, 844, 850, 854, 868, 874, 948)), but this is a *post hoc* argument not raised by the ALJ.  "[W]hat matters are the reasons articulated *by the ALJ*," not the reasons advanced by the Commissioner on appeal.  *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).

objective medical evidence in the record." (citation omitted)); *Powers*, 207 F.3d at 435-36 ("The discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating her condition."); *Ellis v. Astrue*, No. 2:09cv145, 2010 WL 3782265, at *20 (N.D. Ind. Sept. 30, 2010) (affirming the ALJ's discounting of the claimant's complaints given the discrepancies between the severity of the self-reported symptoms and the lack of treatment for the purported condition); 20 C.F.R. § 404.1529(c)(3).

Consequently, the ALJ's consideration of Mueller's symptom testimony about his urinary frequency was not "patently wrong" and thus it does not, in and of itself, necessitate a remand of the ALJ's decision.

2. Daily Activities

Mueller also contends that the ALJ "relied unduly on his minimal daily activities to reject his [symptom] testimony." (ECF 13 at 13). Mueller seemingly faults the ALJ for noting that he "has no problems grocery shopping as long as he uses a cart" and "ha[s] no problems sitting in a car for at least thirty minutes." (AR 34).

"ALJs are tasked with reviewing the evidence provided and assessing whether a claimant is exaggerating the effects of [his] impairments, and reviewing daily-living activities is an important part of that evaluation." *Green*, 781 F. App'x at 526 (citations omitted). Contrary to Mueller's assertion, "there is no evidence that the ALJ overstated [Mueller's] ability to perform daily activities." *Id*. at 526-27. Nor did the ALJ improperly equate Mueller's performance of daily activities with an ability to perform full-time work. (*See* AR 34). Rather, the ALJ properly considered Mueller's daily activities as just one factor in her assessment of Mueller's symptom

testimony.  *Compare Schmidt*, 395 F.3d at 746-47 (considering the claimant's performance of daily activities as a factor when discounting the claimant's credibility), *and Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004), *with Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006) (cautioning ALJs "against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home")*, and Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005).  *See also Contreras v. Berryhill*, No. 16 CV 9037, 2017 WL 3592699, at *6 (N.D. Ill. Aug. 21, 2017) (considering a claimant's daily activities as just one factor in a credibility assessment, in contrast to improperly equating daily activities with an ability to work).  Therefore, Mueller's argument that the ALJ unduly relied on his daily activities is defied by the record.

Mueller also takes issue with the ALJ's consideration that he had "recently gone to Las Vegas," as the ALJ commented that his "traveling long distances [was] inconsistent with his allegations."  (AR 35).  Mueller's travel was a part of his daily activities after his alleged onset date, and thus, it was fair game for the ALJ to consider.  *See, e.g.*, *Ortega v. Berryhill*, No. 17 C 2527, 2018 WL 4144636, at *5 (N.D. Ill. Aug. 30, 2018) ("[I]t was permissible for the ALJ to generally consider how Plaintiff's ability to travel would undermine his credibility." (citation omitted)).  Mueller stresses, however, that there was no evidence that he "engaged in strenuous activity or work-related activity on his trip to Las Vegas," and absent such, the ALJ's assessment of his travel was unfair.  (ECF 13 at 15).  Indeed, the ALJ should have questioned Mueller more about the details of his daily activities when traveling before discounting his symptom testimony

on this basis.[4]  *See Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) ("[T]he record does not

indicate how going on vacation was inconsistent with [the claimant's] claimed degree of

physical limitation.").  Consequently, on the current record, the ALJ's reasoning with respect to

Mueller's trip to Las Vegas does not support her discounting of his symptom testimony.  Having

said that, because the ALJ fairly characterized Mueller's daily activities for the most part, the

ALJ's consideration of Mueller's trip, in and of itself, does not rise to the level of necessitating a

remand of the ALJ's credibility determination.  *See, e.g.*, *Dailey v. Colvin*, No. 1:14-cv-00294-

SEB-TAB, 2015 WL 331859, at *6 (S.D. Ind. Jan. 21, 2015) ("Though the ALJ mischaracterized

some of Dailey's activities, the credibility determination was not patently wrong.").

    3.  Use of a Cane

    Mueller also challenges the ALJ's consideration of his use of a cane, which was

prescribed while hospitalized after his stroke two months before the hearing.  In that regard, the

ALJ stated:

> The undersigned notes that the claimant appears to have been prescribed a cane
> after his February 2018 hospital visit, but . . . the claimant was not using a cane
> the day after the visit.  At the claimant's stroke follow-up on February 28, 2018,
> the claimant had full strength and range of motion throughout.  The claimant's
> gait was normal.
>
> Shoaib Rasheed, M.D., the claimant's physician while in the hospital wrote a
> letter dated April 25, 2018, indicating that the claimant sometimes felt unsteady
> on his feet and requested a cane to assist him with getting around and to prevent
> falls.  As noted above, the claimant's gait was found to be normal on examination
> after he was released from the hospital.

---

[4] Neither party suggests this, but it may be that the ALJ viewed the documentation of Mueller's travel to Las Vegas in the medical record as inconsistent with his denial at the hearing that he had taken any recent trips.  (AR 69 ("Q  Have you gone on any recent trips?  Any traveling, driving trips, flying anywhere?  A  No, it's been several years.")).  But the hearing took place in 2018 and Mueller traveled to Las Vegas in late 2015.  (AR 51, 684).  Consequently, Mueller's answer at the hearing was not inaccurate.  Thus, this reasoning does not serve to rehabilitate the ALJ's observation either.

(AR 36 (citing AR 739, 768, 949, 1003)).  Mueller argues that the ALJ's statement was unfair in that it was unreasonable to expect him to get to a medical supply store within twenty-four hours to obtain a cane.  (ECF 13 at 15).

While the ALJ's observation that Mueller did not use a cane one day after it was prescribed may have been a bit harsh, it is still factually grounded in the record and not "patently wrong."  *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008).  Notably, Mueller does not argue that the ALJ erred by failing to include his purported use of a cane in the RFC solely based on the prescription for a cane that he received while hospitalized after his stroke.  (ECF 13 at 17-18; *see* AR 61 ("I just know [the doctor] asked me and they put that [fall hazard] bracelet on me when I was admitted.  I came home with the prescription [for a cane] that he'd given me as part of my discharge papers."), 93-94 ("It was my understanding [I was to use the cane] as needed.").  As the ALJ observed, the medical evidence one week after Mueller's stroke revealed that he had full strength and a normal gait.  (AR 36 (citing AR 768, 949)); *see also* AR 59 (the ALJ commenting at the hearing that he "couldn't find anything on those records that mentioned anything about gait problems that would suggest Dr. Carlson is endorsing the need for a cane"), 61 (the ALJ commenting at the hearing that "the inpatient treatment records . . . suggested that by the time [Mueller] was discharged, there were no lasting stroke effects.  He scored only a 1 on the stroke scale and, according to those records, it was gone by the time he was discharged.")).  As such, the ALJ's consideration of Mueller's use of a cane, or lack thereof, is not "divorced from the facts contained in the record."  *Berger*, 516 F.3d at 546.

In sum, "an ALJ's credibility assessment will stand as long as [there is] some support in the record."  *Id.* (alteration in original) (citation and internal quotation marks omitted)).  That is,

an ALJ's reasoning need not be perfect.  *See Halsell v. Astrue*, 357 F. App'x 717, 723 (7th Cir.

2009) ("[A]lthough the ALJ's reasoning is imperfect, there is substantial evidence supporting her

decision to discount [the claimant's] credibility.").  Here, "[t]hough the ALJ's credibility

determination was not flawless, it was far from 'patently wrong.'"  *Simila v. Astrue*, 573 F.3d

503, 517 (7th Cir. 2009).  The ALJ, for the most part, fairly considered the objective medical

evidence, the treatment that Mueller had undergone for his conditions, his daily activities, the

effectiveness of his medications, and his statements to medical providers.  (AR 34-36); *see* 20

C.F.R. § 404.1529(c).  Consequently, the ALJ's consideration of Mueller's symptom testimony,

standing alone, does not require a remand of the Commissioner's final decision.[5]

### D.  Medical Source Opinions

Mueller also challenges the ALJ's consideration of various medical source opinions of

record.  Specifically, Mueller argues that the ALJ misinterpreted the opinion of Kathryn T. Huls,

Pys.D., a consultative mental examiner; improperly weighed the opinions of Dr. James Carlson,

his treating family practitioner; and failed to properly consider as "medical opinions" Dr. Shoaib

Rasheed's prescription for a cane and Dr. Louis Teodori's depression screening.  The Court will

discuss each of these arguments in turn.

### 1.  Dr. Huls

Dr. Huls performed a mental status examination of Mueller and issued a medical source

statement in August 2016.  (AR 726-30).  Dr. Huls assigned Mueller a diagnosis of adjustment

disorder with depressed mood and opined as follows:

---

[5] Having said that, because as discussed *infra* the Commissioner's decision will be reversed based on Mueller's third argument concerning a need for an updated medical review, the ALJ is encouraged on remand to remedy the deficiencies identified herein pertaining to her consideration of Mueller's symptom testimony.

Mr. Mueller's ability to learn, remember and comprehend simple instructions appears adequate.  Mr. Mueller's ability to attend, concentrate and complete simple tasks seems adequate for most situations; he may be mildly distractible and/or have mild difficulties sustaining mental effort on challenging tasks.  Mr. Mueller's ability to interact with coworkers, supervisors and the public in typical work settings is likely to be average.  Mr. Mueller's ability to handle routine changes within the workplace is likely to be fair.

(AR 730).

The ALJ penned two lengthy paragraphs on Dr. Huls's opinion, discussing the above medical source statement in detail.  (AR 32-33).  The ALJ summarized:  "The claimant's functioning is found to be overall intact in all areas, specifically with simple tasks and normal work situations."  (AR 32).  The ALJ assigned "significant weight" to Dr. Huls's opinion, reasoning that Dr. Huls personally examined Mueller and explained her findings, and that the opinion "is consistent with no treatment history for mental impairments."  (*Id.*); *see* 20 C.F.R. § 404.1527(c) (identifying the examining relationship, supportability, and consistency with the record as a whole as several factors an ALJ should consider when evaluating a medical source opinion).

Mueller asserts that Dr. Huls's opinion "suggests a limitation to unskilled work," and thus, that the ALJ misinterpreted the opinion.  (ECF 13 at 16).  Mueller adds that the vocational expert testified that a limitation to unskilled work would preclude the performance of Mueller's past relevant work, which was skilled or semi-skilled.  (*Id.* (citing AR 101)).  Mueller points out that if he were limited to unskilled sedentary work, he would be deemed disabled under the grid rules as of his fiftieth birthday.  (*Id.* (citing 20 C.F.R. Part 404, Subpart P, App'x 1, § 201)).

Mueller's proffered interpretation of Dr. Huls's opinion, however, is defied by the plain language of the record.  While Dr. Huls indicated that Mueller may be "mildly distractible and/or

have mild difficulties sustaining mental effort on challenging tasks" (AR 730), Dr. Huls did *not* opine that Mueller was incapable of performing skilled or semi-skilled tasks.  Nor did she limit Mueller to unskilled work.  Therefore, Mueller's challenge to the ALJ's consideration of Dr. Huls's opinion is a nonstarter.

> 2.  Dr. Carlson

Dr. Carlson, Mueller's treating family practitioner, penned several opinions about Mueller's limitations.  Dr. Carlson opined in July 2016 that Mueller could frequently lift five pounds; stand or walk less than one hour and sit for less than two hours in an eight-hour workday; occasionally push, pull, reach, handle, finger, and feel; occasionally climb, balance, stoop, kneel, crouch, and crawl; and could not work full-time.  (AR 708).  He based these limitations on Mueller's lateral epicondylitis, COPD, hypertension, prostate cancer, feet neuropathy, and ulnar nerve neuropathy.  (AR 709).  Dr. Carlson reiterated the opinion in February 2017, except that he further restricted Mueller from any climbing, balancing, stopping, kneeling, crouching, crawling, or reaching.  (AR 735-36).  Then in April 2018, Dr. Carlson wrote a letter "To Whom It May Concern" stating that in 2013 and 2014 Mueller had decreased muscle strength rated two to three out of five in his upper and lower extremities, and that Mueller had recently suffered a stroke with "increased weakness in the upper and lower extremities bilaterally and extreme fatigue."  (AR 1001).

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances."  *Clifford*, 227 F.3d at 870 (citations omitted); *see* 20 C.F.R. § 404.1527(c)(2).  However, this principle is not absolute, as "[a] treating physician's opinion

regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."[6]  *Clifford*, 227 F.3d at 870 (citation omitted); *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).  The Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion.  *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(c)(2).

Here, the ALJ assigned "little" weight to Dr. Carlson's medical source opinions, explaining that he found them internally inconsistent with Dr. Carlson's own treatment records. (AR 36).  Specifically, the ALJ observed that Dr. Carlson's treatment note dated the same day as his July 2016 medical source opinion indicated that Mueller's pain was "well-controlled," that he was in no acute distress, and that he had full strength and normal range of motion.  (*Id.* (citing AR 715)).  The ALJ further observed that Dr. Carlson's recent treatment notes (including the day after Mueller was released from the hospital following his stroke) and his notes from 2013 and 2014 all reflect that Mueller had full strength in his extremities.  (*Id.* (citing AR 768)).  Due to these internal inconsistencies, the ALJ had "good reasons" to discount Dr. Carlson's restrictions. *See Phillips v. Astrue*, 413 F. App'x 878, 884 (7th Cir. 2010) ("If the ALJ discounts the opinion of a claimant's treating physician, the ALJ must offer 'good reasons' for doing so." (citations omitted)).

Mueller, however, argues that the ALJ's reasoning for assigning "little" weight to the

---

[6] In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion:  (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner.  *See Books*, 91 F.3d at 979; 20 C.F.R. § 404.1527(c).

opinions of Dr. Carlson was "inadequate" in that the ALJ failed to weigh the opinions in accordance with the regulatory factors in 20 C.F.R. § 404.1527(c) after determining the opinions were not entitled to controlling weight.  (ECF 13 at 17).  But the ALJ did note several of these factors, including that Dr. Carlson was a treating physician, the nature of the relationship, and the consistency of the opinions with the evidence of record.  (AR 36; *see also* AR 35).  This is sufficient, as an ALJ need not expressly discuss all of the regulatory factors.  *See Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) ("The ALJ did not explicitly weigh every factor while discussing her decision to reject Dr. Preciado's reports, but she did note the lack of medical evidence supporting Dr. Preciado's opinion, and its inconsistency with the rest of the record.  This is enough." (internal citations omitted)); *Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008) (affirming the ALJ's discounting of the physician's opinion where the ALJ discussed just two of the relevant factors).

Consequently, Mueller's challenge to the ALJ's consideration of Dr. Carlson's opinions is unavailing.  The ALJ's discounting of Dr. Carlson's restrictions is supported by substantial evidence and adequately articulated.

3.  Dr. Rasheed

Next, Dr. Rasheed, Mueller's physician during his hospitalization in February 2018 after his stroke, wrote Mueller a prescription for a cane.  (AR 739).  Approximately two months later, Dr. Rasheed penned a letter to Mueller's attorney, stating that "Even though [Mueller] was able to ambulate he sometimes felt unsteady on his feet and requested a cane to assist him with getting around and to prevent falls."  (AR 1003).

Mueller argues that Dr. Rasheed's prescription for a cane was a "medical opinion," and

16

thus, that the ALJ purportedly erred by failing to consider it as such.  (ECF 13 at 17; ECF 19 at 6

("All medical opinions of record must be evaluated.")).  On that front, "[m]edical opinions are

statements from acceptable medical sources that reflect judgments about the nature and severity

of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis,

what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental

restrictions."  20 C.F.R. § 404.1527(a)(1).  While his argument is less than clear, Mueller seems

to suggest that Dr. Rasheed's prescription equates to an opinion that Mueller needed a cane for

balance.

    As discussed earlier, the ALJ did consider Dr. Rasheed's prescription and subsequent

letter.  (AR 36).  But the ALJ then observed that a medical examination one week after Mueller's

release from the hospital revealed that he had a normal gait, full strength, and full range of

motion.  (*Id.* (citing 768, 949)).  Thus, the ALJ fairly considered the cane prescription in the

context of other objective medical evidence of record.  *See Sims v. Comm'r of Soc. Sec.*, No.

2:16-cv-342, 2017 WL 4236578, at *12 (S.D. Ohio Sept. 25, 2017) (affirming the ALJ's RFC

that did not accommodate use of a cane where a physician's prescription for a cane and his

opinion that the claimant "sometimes needs a cane" was belied by the claimant's other medical

records and physical activities); *Halama v. Comm'r of Soc. Sec.*, No. 1:12 CV 1859, 2013 WL

4784966, at *8 (N.D. Ohio Sept. 5, 2013) ("[T]he mere notation by a physician that a claimant

should use a cane is not evidence of medical necessity.  Indeed, the key finding in such cases is

medical documentation establishing the need for a hand-held assistive device to aid in walking

and standing and describing the circumstances for which it is needed." (citations and internal

quotation marks omitted)).  Significantly, this is *not* a case where the ALJ failed to consider the

17

cane prescription at all.  *Cf. Thomas v. Colvin*, 534 F. App'x 546, 550 (7th Cir. 2013) ("The error in this case . . . is not that the medical evidence *required* the ALJ to find that Thomas needed a cane to stand and walk, but that the ALJ failed to consider the issue at all, leaving us without a finding to review.").

Furthermore, "[Mueller] fails to state any opinion from [Dr. Rasheed] that would support his claim other than the fact that [Dr. Rasheed] prescribed the use of a cane." *Estelle v. Astrue*, 2012 WL 4369296, at *15 (M.D. Fla. July 31, 2012) ("The Plaintiff's own complaints are not sufficient medical evidence to support his claim. . . .  [A] prescription for a cane is not an opinion that the Plaintiff is disabled.").  In fact, Dr. Rasheed's hospital discharge summary does not even mention the cane or any difficulty with ambulation.  (AR 952-57).  And the letter sent by Dr. Rasheed to Mueller's attorney two months later simply reflects that Mueller reported that he "sometimes felt unsteady on his feet and requested a cane to assist him with getting around and to prevent falls."  (AR 1003).  This suggests that the cane prescription was reflective of Mueller's own statements, rather than Dr. Rasheed's medical opinion.  *See Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012) (finding a doctor's statement that the claimant "does need a crutch" lacked "the specificity necessary to determine whether this was the doctor's *medical opinion or merely a restatement of what was told to him by [the claimant]"); *Estelle*, 2012 WL 4369296 at *15 (observing that the claimant's arguments were "not related to an opinion given by Dr. Acosta but instead [were] merely claims the Plaintiff himself made to Dr. Acosta").

Consequently, on this record, Mueller's argument that the ALJ erred by failing to consider the cane prescription written by Dr. Rasheed as a "medical opinion" is unavailing.  The ALJ's consideration of the cane prescription is supported by substantial evidence.

4. Dr. Teodori

Mueller similarly claims that the ALJ erred by failing to consider a depression screening completed by Dr. Teodori, a physician at the Neurological Institute and Speciality Centers, as a "medical opinion." (ECF 13 at 18). The depression screening, which noted "Minor Depression; Major Depression, mild," was included in Dr. Teodori's February 2018 progress note as a follow-up to Mueller's recent hospitalization for his stroke. (AR 950). Dr. Teodori's progress note also included screenings for alcohol use, obesity, sleep apnea, and tobacco use. (AR 947-50).

Again, Mueller overreaches in advancing this "medical opinion" argument. While Dr. Teodori included a depression screening among other routine screenings in his progress note, he did not diagnose a mental impairment at the February 2018 visit, did not recommend any type of mental evaluation or treatment as a result of the screening, and did not assign any mental limitations. (AR 951). In fact, when performing the physical examination, Dr. Teodori observed that Mueller had a normal mood and an appropriate affect. (AR 949). An ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). Only when an ALJ ignores an entire line of evidence does his decision fall "below the minimal level of articulation required." *Id.* Here, Dr. Teodori's depression screening, absent any mental diagnosis, recommendations for further care, or mental limitations, falls short of constituting an entire line of evidence that the ALJ failed to consider.

Therefore, on the record presented, the ALJ did not commit a reversible error by failing to expressly discuss the results of Dr. Teodori's depression screening as a "medical opinion" in her decision.

*E.  Updated Medical Review*

The ALJ ultimately gave "some" weight to the opinion of Dr. J.V. Corcoran, a state agency physician who reviewed the record in September 2016 and found that Mueller could perform medium-exertional work.  (AR 37, 121-24).  Mueller argues that evidence added after review of the record by Dr. Corcoran "changed the picture so much that medical and mental expert reviews were necessary to determine the limitations arising from that evidence . . . ." (ECF 13 at 21).  For the following reasons, the Court agrees, at least in part.

Mueller catalogs the following evidence added after Dr. Corcoran's review of the record: (1) a pulmonary function test in October 2016 showed a "moderate obstruction" (AR 732-34, 800), which was a worsening from the pulmonary function test in May 2016 showing a "mild obstruction" (AR 692); (2) Dr. Carlson's medical source opinions dated July 2016 and February 2017 assigning lifting restrictions, reduced ability to walk and stand, and postural limitations[7] (AR 708-09, 735-36); (3) the records evidencing Mueller's stroke in February 2018 (AR 884, 901); (4) the CT scans (AR 50, 891-93), an MRI (AR 904), and ECGs (AR 903, 933-34, 967, 979-80) relating to his hospitalization; (5) the cane prescription by Dr. Rasheed (AR 739, 1003); (6) the depression screening by Dr. Teodori (AR 950); and (7) a sleep study indicating mild obstructive sleep apnea (AR 995).  Mueller emphasizes that the combination of this medical evidence could change Dr. Corcoran's opinion to limit him to unskilled sedentary work, which would mandate a finding of disability under the grid rules as of his fiftieth birthday.  (ECF 13 at 21 (citing 20 C.F.R. Part 404, Subpart P, App'x 1 § 201)).

---

[7] While presumably Dr. Carlson's July 2016 medical source statement would have been part of the record in September 2016, Dr. Corcoran's review states that "[t]here is no indication that there is medical or other opinion evidence," which suggests that he may not have reviewed Dr. Carlson's medical source statement.  (AR 121).

When assigning "some" weight to Dr. Corcoran's opinion, the ALJ expressed the following reasoning:  "Dr. Corcoran has program knowledge, and Dr. Corcoran reviewed the medical evidence of record.  This opinion is consistent with normal physical examinations throughout the record."  (AR 37).  But a moderate obstruction on a pulmonary function test, suffering an ischemic stroke, consistent elbow pain levels of 5/10 and above, and a prescription for a cane are not indicative of "normal physical examinations."  *See Williams v. Berryhill*, 707 F. App'x 402, 406 (7th Cir. 2017) ("[T]he ALJ's analysis is flawed because it rests on mischaracterizations of the record.  Williams's medical history is not 'normal'—tests consistently have shown at least mildly reduced heart and lung function, and the medical record is replete with references to shortness of breath and difficulty walking.").

Furthermore, the ALJ seemed to heavily rely (particularly when discounting Mueller's elbow pain complaints and Dr. Carlson's conservative limitations) on the fact that Mueller regularly exhibited full strength and normal range of motion in his extremities.  (*See* AR 33, 35-36).  But in doing so, the ALJ failed to consider that Dr. Carlson's five-pound lifting restriction may have stemmed from Mueller's chronic elbow pain, rather than from a lack of strength or range of motion in his upper extremities.  "Indeed, as several courts in this circuit have acknowledged, even full muscle strength is consistent with impairments that cause pain and thereby affect a claimant's functional limitations . . . ."  *Otis S. v. Saul*, No. 1:18-CV-372-WCL-JPK, 2019 WL 7669923, at *3 (N.D. Ind. Dec. 19, 2019); *see also id.* at *3 n.4 (collecting cases).  "An ALJ's independent reliance on a claimant's muscle strength to depart from a medical opinion regarding such limitations therefore suggests an improper tendency to 'play doctor.'"  *Id.* at 3; *see also Charles B. v. Saul*, No. 18 C 1377, 2019 WL 3557055, at *9 (N.D. Ill. Aug. 1, 2019) (finding that the ALJ improperly played doctor when he found that evidence of full

21

strength in the claimant's extremities was inconsistent with a doctor's opinion on the claimant's limitations and severe pain); *Fansler v. Astrue*, No. 1:07-CV-00081, 2008 WL 474205, at \*7 (N.D. Ind. Feb. 19, 2008) ("[T]he ALJ succumbed to the temptation to 'play doctor' when he independently concluded that normal muscle strength is inconsistent with chronic pain.").

Throughout 2017 and 2018, Mueller consistently reported that his elbow pain was "poorly controlled" with pain levels of "5/10" when on medications and "8/10" without medications.  (*See, e.g.*, AR 766, 771, 776, 781, 786, 791, 796, 801, 805, 811, 815, 820, 824, 829).  This suggests a worsening of Mueller's chronic elbow pain after Dr. Corcoran's review in 2016, as his elbow pain was often described in 2015 and 2016 as "fairly well controlled" with a pain rating from "2/10" to "5/10."  (*See, e.g.,* AR 354, 364, 374, 384, 410, 697, 700).

While the ALJ did not entirely rely on Dr. Corcoran's opinion when crafting the physical RFC, he assigned the rather stale opinion more weight than any other medical opinion of record that addressed Mueller's physical restrictions.  (*See* AR 35-37).  Here, the medical evidence of record subsequent to Dr. Corcoran's review in September 2016 "could reasonably change [Dr. Corcoran's] opinion," and by logical extension, the ALJ's reliance on that decision when crafting the RFC.[8]  *Stage v. Colvin*, 812 F.3d 1121, 1125-26 (7th Cir. 2016) ("Before basing a

---

[8] Mueller also urges that an updated medical review is necessary because Dr. Corcoran did not consider whether Mueller's stroke satisfied listing 11.04, vascular insult to the brain.  (ECF 13 at 19 (citing AR 106-12, 114-25)).  But there is no evidence of record that suggests that Mueller satisfied either A, B, or C below, as required by the listing:

A. Sensory or motor aphasia resulting in ineffective speech or communication persisting for at least 3 consecutive months after the insult; or

B. Disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the insult; or

C. Marked limitation in physical functioning and in one of the following areas of mental functioning, both persisting for at least 3 consecutive months after the insult:

1. Understanding, remembering, or applying information; or

denial on such a finding, the ALJ should have considered contrary evidence and obtained a medical opinion based on a complete record." (citation omitted)); *Fike v. Astrue*, No. 1:11-CV–00168, 2012 WL 1200670, at *8 (N.D. Ind. Apr. 10, 2012) (remanding case where the ALJ relied on the opinion of the state agency physicians who had neither examined the claimant nor reviewed the permanent restrictions assigned by the claimant's treating physician); *Ulloa v. Barnhart*, 419 F. Supp. 2d 1027, 1036 (N.D. Ill. 2006) (same).

Consequently, because the outcome of Mueller's physical RFC could reasonably have been different had the state agency physician had the more recent medical records before him, a remand for an updated review by a state agency physician and a reconsideration of Mueller's physical RFC is warranted.  And as stated earlier, while the deficiencies in the ALJ's consideration of Mueller's symptom testimony identified *supra* do not necessarily serve as an independent basis to remand the Commissioner's decision, upon remand the ALJ should also remedy these deficiencies concerning Mueller's symptom testimony.

## IV.  CONCLUSION

For the foregoing reasons, the Commissioner's decision is REVERSED, and the case is REMANDED to the Commissioner in accordance with this Opinion and Order.  The Clerk is DIRECTED to enter a judgment in favor of Mueller and against the Commissioner.

---

2. Interacting with others; or

3. Concentrating, persisting, or maintaining pace; or

4. Adapting or managing oneself.

20 C.F.R. Part 404, Subpart P, App'x 1 § 11.04 (internal citations omitted).  Consequently, an updated medical review would not be necessary solely for purposes of considering listing 11.04 because the ALJ's step-three determination would be the same.

SO ORDERED.

Entered this 11th day of May 2020.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge